# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IRIS F.,

        Plaintiff,

    v.

KILOLO KIJAKAZI,
  ACTING COMMISSIONER OF
  SOCIAL SECURITY,[1]

       Defendant.

No. 19 CV 2368

Magistrate Judge McShain

## MEMORANDUM OPINION AND ORDER

Plaintiff Iris F. brings this action under 42 U.S.C. § 405(g) for judicial review of the Social Security Administration's (SSA) decision denying her application for benefits. For the following reasons, the Court grants plaintiff's motion for summary judgment [14],[2] denies the Acting Commissioner of Social Security's (Acting Commissioner) request for affirmance [22], reverses the SSA's decision, and remands this case for further administrative proceedings.

## Procedural Background

In January 2016, plaintiff filed a Title II application for a period of disability and disability insurance benefits, alleging an onset date of November 1, 2015. [12-1]

---

[1] In accordance with Fed. R. Civ. P. 25(d), Kilolo Kijakazi, the Acting Commissioner of Social Security, is substituted as the defendant in this case in place of the former Commissioner of Social Security, Andrew Saul.

[2] Bracketed numbers refer to entries on the district court docket. Referenced page numbers are taken from the CM/ECF header placed at the top of filings, with the exception of citations to the administrative record [12-1, 12-2], which refer to the page numbers in the bottom right corner of each page.

13, 462. Plaintiff's claim was denied initially and on reconsideration. [*Id.*] 132-47, 148-65. Plaintiff requested a hearing, which was held by an administrative law judge on November 8, 2017. [*Id.*] 33-78. In a decision dated April 18, 2018, the ALJ ruled that plaintiff was not disabled. [*Id.*] 13-26. The Appeals Council denied review on January 31, 2019 [*id.*] 1-5, making the ALJ's decision the agency's final decision. *See* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely appealed to this Court [1], and the Court has jurisdiction to review the Acting Commissioner's decision under 42 U.S.C. § 405(g).

## Factual Background

Plaintiff, who was 48 years old on the alleged onset date, *see* [12-1] 132, sought disability benefits based on spina bifida, anxiety and depression, neuropathy, cellulitis, leg length discrepancy, prior fusion of the left ankle, club feet, and incontinence. [*Id.*] 462. The ALJ found that plaintiff was capable of performing sedentary work, including her past relevant work as a receptionist. [*Id.*] 23, 25-26. In so ruling, the ALJ gave "little to no weight" to the opinions of plaintiff's treating physicians that plaintiff needed to elevate her legs either 90% or 100% of an eight-hour workday. *See* [*id.*] 23-24. Had the ALJ credited those opinions and incorporated corresponding limitations into plaintiff's residual functional capacity (RFC) determination, plaintiff would have been precluded from performing sedentary work. *See* [*id.*] 73 (testimony of vocational expert). Accordingly, the ALJ's rejection of the treating physicians' opinions respecting plaintiff's need to elevate her legs forms the principal basis for plaintiff's appeal.

2

## A.     Medical Evidence

Plaintiff was born with spina bifida, "a neural tube defect (a disorder involving incomplete development of the brain, spinal cord, and/or their protective coverings) caused by a failure of the fetus's spine to close properly during the first month of pregnancy." *Sarantinos v. Astrue*, No. 10-cv-1196, 2011 WL 2533803, at *1 n.1 (C.D. Ill. Jun. 27, 2011). Plaintiff's spina bifida caused neuropathy, *see* [12-2] 777, 896, "a functional disturbance or pathological change in the peripheral nervous system." *Chihuahua v. Colvin*, No. 13 C 8248, 2016 WL 2897405, at *3 n.5 (N.D. Ill. May 18, 2016). Plaintiff has also been diagnosed with cellulitis, "a spreading bacterial infection of the skin and tissues beneath the skin," *Blackmon v. Astrue*, 730 F. Supp. 2d 867, 873 n.11 (N.D. Ill. 2010), that "usually affects the lower legs" and, "[i]f untreated . . . can spread to the lymph nodes and bloodstream, becoming life-threatening." *Walter R. v. Saul*, No. 1:18-cv-01042-DLP-SEB, 2019 WL 3773795, at *1 n.4 (S.D. Ind. Aug. 12, 2019).

### 1.     Cellulitis and related hospitalizations

In November 2015, plaintiff was hospitalized after presenting to her primary care physician, Janandana K. Jegan-Mohan, with cellulitis in the left shin and foot. [12-1] 56, 722-23; [12-2] 696-97. According to Dr. Jegan-Mohan, plaintiff had been working "on her feet all day and towards the end of her shift her left leg started hurting her considerably"; the next day, plaintiff "developed some redness and swelling" that became "progressively worse." [12-2] 773. At the hospital, plaintiff complained of swelling in her left foot and had leukocytosis and temperature spikes;

she exhibited "left lower extremity edema with notable cellulitis that's approaching the knee"; and there was a large abscess on her left foot that was ultimately punctured and drained. [12-1] 709, 719; [12-2] 774. After five days, plaintiff was discharged from the hospital with instructions to see a podiatrist. [12-1] 706; [12-2] 790.

In light of plaintiff's hospitalization, Dr. Jegan-Mohan prepared a letter for plaintiff's employer stating that it was her "medical opinion that [plaintiff] should not be allowed to stand for any duration of time due to her lower extremity deformities and neuropathy from spina bifida." [12-2] 777.

At a follow-up appointment on December 23, 2015, Dr. Jegan-Mohan observed that plaintiff "was off work due to a significant left wound that was failing to heal adequately." [12-2] 778. Plaintiff told Dr. Jegan-Mohan that she wanted to return to work, but she "need[ed] a letter limiting her physical activity so that she does not end up with a similar wound." [*Id.*]. Dr. Jegan-Mohan found that the wound was healing well and provided the requested letter, which stated that plaintiff should not be allowed to stand for more than 15 minutes or walk more than 150 feet two to three times per hour due to her spina bifida and the associated pain. [*Id.*] 779-80.

Plaintiff saw Dr. Jegan-Mohan again on February 5, 2016. [12-2] 781-82. She observed that plaintiff has spina bifida, significant gait disorder due to spina bifida with notable spinal curvature, and significant peripheral neuropathy. [*Id.*]. Dr. Jegan-Mohan's treatment note from this visit also states:

> [Plaintiff] has had several hospitalizations over the last years with falls cellulitis and wound infections. I had recommended in previous visits

4

the patient consider disability but she had been reluctant until this point to do so as she wished to be a productive member of society. I explained to her that with aging her debility will result in further hospitalizations. She voices understanding and agreement and has now decided to apply for disability. I am in full agreement with her obtaining this and a letter will be provided for her.

[*Id.*] 781.

In November 2016, Dr. Jegan-Mohan prescribed plaintiff a diabetic shoe after diagnosing plaintiff with a "non-healing ulcer of the left foot." [12-2] 813; *see also* [*id.*] 996-1000 (plaintiff had "open wound" on "left-foot dorsal"). Dr. Jegan-Mohan's treatment notes reflect that a wound on plaintiff's foot had healed, but plaintiff developed a "left dorsal foot pressure ulcer" in a different area. [12-2] 1017. A contemporaneous x-ray of plaintiff's left foot revealed the presence of "mild to moderate tissue swelling" and "[b]ony hypertrophy . . . increased in the foot relative to" a July 2013 examination. [*Id.*] 1049. On December 21, 2016, plaintiff was seen in connection with a pressure ulcer on her left foot that was caused by a footwear injury. [*Id.*] 1076, 1083-84. Plaintiff had edema and skin breakdown, and her wound was treated with saline rinse and a compression wrap. [*Id.*] 1076-77.

Plaintiff was hospitalized in connection with her cellulitis again on January 4, 2017. [12-1] 56-57; [12-2] 1290-91, 1293; *see also* [*id.*] 873 (treating podiatrist's note from January 9, 2017 reflecting that plaintiff called to cancel appointment because she "has been in the hospital for one week with cellulitis in feet"). Plaintiff presented to the emergency room with pain in her left groin that was worse with movement and palpitation, a fever, and chills. [12-2] 1290-91, 1293. An infectious-disease consult

established that plaintiff had "moderate cellulitis in the left ankle and just proximal to that[.]" [*Id.*] 1308. Plaintiff was discharged on January 9, 2017. [*Id.*] 1310.

### 2. Podiatric treatment

On April 18, 2016, plaintiff was seen by podiatrist Daryl Caneva in connection with a hammer toe on her right foot, which was exacerbated by "ambulation and prolonged standing" and which caused "gait disturbance and callus." [12-2] 826-28. Dr. Caneva's treatment plan called for topical medication and paring the lesions on plaintiff's foot. [*Id.*]. Plaintiff returned to Dr. Caneva's office on May 8, 2016 and requested "callous debridement" [12-2] 829, a procedure entailing the "removal of unhealthy tissue from a wound to promote healing." *Winn v. Colvin*, Civil No. 15-cv-204-CJP, 2016 WL 4154907, at *4 n.4 (S.D. Ill. Aug. 5, 2016). At follow-up appointments on May 27, June 17, July 8, July 29, and August 19, 2016, Dr. Caneva treated plaintiff by, *inter alia*, performing debridements and paring lesions on her left marginal heel, right 1st and 5th MPJ, and left plantar 4th MPJ. *See* [12-2] 832-34, 835-37, 838-40, 842-44, 845-47.

Treatment notes from plaintiff's appointments with Dr. Caneva in late 2016 and into early 2017 establish that plaintiff continually presented with neuropathic ulcers on one or both of her feet. *See, e.g.*, [12-2] 855-57 (October 14, 2016 treatment note reflecting that plaintiff presented with "redness/cellulitis in right foot" that developed six days earlier that was treated with ointment, paring of several lesions, and "removal of devitalized tissue"); [*id.*] 874-76 (January 13, 2017 treatment note reflecting that plaintiff presented for follow-up care for ulcer on right foot and "nail

and callous care," treatment of which involved "manual debridement (of painfully long dystrophic nails 1-5)" and "paring of lesions" on "right plantar 1st MPJ"); (January 27, 2017 treatment note stating that plaintiff received manual debridement of nails bilaterally, "debridement of gran tissue left plantar heel and keratosis, plantar left 2nd MTPJ[, and] plantar 1st MTPJ"); [*id.*] 885-87 (February 27, 2017 treatment note stating that plaintiff presented with wart on left heel and documenting, *inter alia*, "debridement of verrucoid lesion left plantar heel with application of betadine ointment").

After an appointment with plaintiff on April 15, 2017, Dr. Caneva opined in a contemporaneous treatment note that plaintiff "is at risk for skin break down and cellulitis if she stands or walks more than 5-10 minutes at a time because of neuropathy secondary to spina bifida, ankle joint fusion left with limb length discrepancy and steppage gait, and chronicity of plantar callouses." [12-2] 896.

Plaintiff returned to Dr. Caneva on September 22, October 2, and October 13, 2017 in connection with a neurotrophic ulcer on her right foot and a wart on her left heel. [12-2] 1414-15, 1418-19, 1422-23. At each appointment, Dr. Caneva treated plaintiff by "paring lesions" and performing an "excisional sharp debridement with scalpel of non vital skin tissue of ulcer right 5th MTJ." [*Id.*] 1416, 1420, 1424. At the conclusion of each of these appointments, Dr. Caneva counseled plaintiff "regarding treatment" of her condition, including "elevation." [*Id.*] 1416, 1420, 1424.

### 3. Treating physicians' RFC questionnaires

Dr. Caneva completed a residual functional capacity questionnaire on May 1, 2017. [12-2] 821-25. He noted that he had treated plaintiff twice per month, and that plaintiff's symptoms–which included difficulty ambulating, callouses, joint deformity, tenderness, and swelling–could be expected to frequently interfere with her attention and concentration. [*Id.*] 821-22. Caneva further observed that plaintiff's impairments were likely to produce good days and bad days, and that plaintiff was likely to be absent from work more than four days per month. [*Id.*] 824. Dr. Caneva opined that plaintiff needed to elevate her legs off the ground while sitting, and that if plaintiff had a sedentary job she would need to elevate her legs for 90 percent of an eight-hour workday. [*Id.*] 823.

Dr. Jegan-Mohan completed a similar questionnaire on May 17, 2017. [12-2] 902-06. Noting that she had treated plaintiff for eight years, Dr. Jegan-Mohan opined that plaintiff's symptoms included chronic pain, gout, and instability, and that plaintiff's prognosis was "poor–progressive co-morbidities." [*Id.*] 902. Jegan-Mohan also observed that plaintiff was "prone to infections due to neuropathy from her spina bifida." [*Id.*] 905. Finally, Dr. Jegan-Mohan opined that, if plaintiff held a sedentary job, she would need to elevate her legs above her hips for 100% of an eight-hour workday. [*Id.*] 904.

### B. Hearing Testimony

At the administrative hearing, plaintiff testified that she lived with her son, daughter-in-law, and their three children. [12-1] 45, 61-62. Plaintiff's son ordinarily

did the family's grocery shopping–it had been "a few months" since plaintiff had shopped for groceries–but when plaintiff went she would "hold onto the cart" while walking. [*Id.*] 60. Plaintiff's daughter-in-law did the family's cooking, and plaintiff did not take care of her grandchildren "at all." [*Id.*] 61-62. Plaintiff testified that she could do her own laundry. [*Id.*] 61.

Plaintiff worked as a receptionist at a uniform company until 2005, where she sat most of the day, answered phones, and filed. [12-1] 52. Plaintiff then worked as a phlebotomist at a hospital until 2014. [*Id.*] 53. In this role, plaintiff "had to call the patient[s] to [her] room" so that she was not "like walking all over the hospital[.]" [*Id.*] 54. Plaintiff lost the phlebotomist job after a fall at work and the hospital "thought it would be better if I would go to a different position." [*Id.*] 53. She then began working part-time as a lab assistant at the hospital, where she cultured specimens while sitting. [*Id.*] 53-54.

Plaintiff began driving for Uber in 2015, after losing the lab assistant position. [12-1] 47. Plaintiff tried to drive five days per week, but there was no guarantee that she would be called to drive someone each day. [*Id.*] 49. Plaintiff testified that she "can't be in the car for a long period of time," which she described as an hour. [*Id.*] 46. There were days when plaintiff was unable to drive "due to a health issue, and I'm not able to push the pedal with my foot." [*Id.*] 50. Asked by the ALJ "[h]ow many times a week do you think you wanted to [drive], and you just couldn't because of your health issue," plaintiff responded, "All the time, every day" but "I have to . . . I push through." [*Id.*] 50. When the ALJ asked plaintiff if there were "any days where you

9

don't even try to push through it," plaintiff said that "maybe three times" per week she would simply "stay home and lift up [her] foot." [*Id.*] 50-51.

Regarding her physical symptoms, plaintiff testified that her left leg was very week, that she has "tendencies of falling," and that she had used a cane since her left ankle fusion surgery ten or twelve years earlier. [12-1] 55. Plaintiff had fallen in a CVS parking lot the week before the hearing, and she estimated that, as of the mid-November 2017 hearing, she had fallen five times in 2017. [*Id.*] 63-65. Plaintiff testified that she constantly had episodes of cellulitis, that her cellulitis can "flare[ ] up," and that she can control it with antibiotics if she "can catch it on time." [*Id.*] 57. Plaintiff also testified that she has to elevate her legs "all day." [*Id.*] 57-58.

### C.    ALJ's Decision

Relying on the standard, five-step analysis for deciding disability claims, the ALJ issued an unfavorable decision denying plaintiff's claim. [12-1] 13-26.

At step one, the ALJ found that plaintiff had engaged in substantial gainful activity after the alleged onset date, from November 2015 through January 31, 2017. [12-1] 15-16. More specifically, the ALJ found that plaintiff began working as an Uber driver in November 2015, and that the income she generated during this time was "in excess of the levels required to qualify as substantial, gainful activity." [*Id.*] 16.[3] Although plaintiff continued working for Uber after February 2017, the ALJ determined that plaintiff's "impairment related expenses" became "notably higher"

---

[3] Despite this finding, and "out of an abundance of caution," the ALJ considered the "extensive medical records prior to February 1, 2017" in deciding plaintiff's case. [12-1] 20.

during this period, such that, after February 1, 2017, plaintiff's Uber driving no longer constituted substantial gainful activity. [*Id.*].

At step two, the ALJ found that plaintiff had the following severe impairments: spina bifida, status post left ankle fusion, recurrent cellulitis, and status post laminectomy. [12-1] 16. The ALJ also considered the evidence of plaintiff's "peripheral neuropathy and pressure ulcer of the left foot . . . under the broad umbrella of the claimant's other aforementioned conditions." [*Id.*] 17. At step three, the ALJ ruled that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, App'x 1. [*Id.*] 18-19.

The ALJ then determined that plaintiff had the residual functional capacity (RFC) to perform sedentary work as defined in 20 C.F.R. § 404.1567(a), except that plaintiff could never climb ladders, ropes, or scaffolding, and could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs. [12-1] 19. The ALJ recognized that Dr. Jegan-Mohan had opined that plaintiff needed to elevate her legs above hip level for the entire work day, and that Dr. Caneva had similarly opined that plaintiff needed to elevate her feet off the ground for 90 percent of an eight-hour workday. [*Id.*] 23, 24. But the ALJ concluded that plaintiff's "continued work-related activity through the date of the hearing" was inconsistent with Dr. Jegan-Mohan's opinion [*id.*] 23, while the ALJ ruled that Dr. Caneva's opinion was "wholly unsupported by any medical evidence of record suggesting any need for elevation at any level." [*Id.*] 24.

11

Based on this RFC determination, the ALJ concluded at step four that plaintiff was capable of performing her past relevant work as a receptionist. [12-1] 25. Because the ALJ's ruling at step four meant that plaintiff was not disabled, *see* 20 C.F.R. § 404.1520(f), the ALJ did not proceed to step five and found that plaintiff was not entitled to benefits.

## Legal Standard

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

To determine whether a claimant is disabled, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently unemployed; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any listed impairment; (4) whether the claimant can perform her past relevant work; and (5) whether the claimant is unable to perform any other available work in light of her age, education, and work experience. *See* 20 C.F.R. §§ 404.1520(a)(4) & 416.920(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

The Court reviews the ALJ's decision deferentially to determine if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is "not a high threshold: it means only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Karr v. Saul*, 989 F.3d 508, 511 (7th Cir. 2021) (quoting *Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019)). At the same time, the standard "is not entirely uncritical. Where the Commissioner's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Brett D. v. Saul*, No. 19 C 8352, 2021 WL 2660753, at *1 (N.D. Ill. June 29, 2021) (internal quotation marks and citation omitted).

### Discussion

Plaintiff seeks reversal of the ALJ's decision on two grounds.

First, plaintiff argues that the ALJ's RFC determination is not supported by substantial evidence because the ALJ "failed to account for [her] need to elevate her legs or [her] history and risk of falling." [15] 4. In rejecting the opinions of her primary care physician and podiatrist that plaintiff needed to elevate her legs for either 90% or 100% of the workday, plaintiff argues that the ALJ "ignored all of the medical evidence of [her] nearly constant bilateral foot ulceration" that formed the basis of the doctors' opinions. [*Id.*] 6. Regarding her history and risk of falls, plaintiff argues that the ALJ entirely failed to address this issue in her decision.

Second, plaintiff argues that the ALJ erred in her subjective symptoms analysis. [15] 8-10. According to plaintiff, the ALJ's conclusion that plaintiff's allegations regarding the severity of her symptoms were inconsistent with the

evidence of her "grossly intact physical functioning" during the relevant timeframe cannot be reconciled with the evidence that plaintiff suffered from nearly constant neurotrophic ulceration on one or both of her feet. [*Id.*] 9. Plaintiff also argues that the ALJ placed undue weight on her ability to perform certain activities of daily living because there was no evidence that plaintiff could "perform any of her activities in a manner approaching a full-time basis." [*Id.*] 9-10.

The Court agrees with plaintiff that substantial evidence does not support the ALJs RFC determination and that the ALJ's decision must accordingly be reversed.[4]

"A disability claimant's RFC describes the maximum she can do in a work setting despite her mental and physical limitations." *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014). "An ALJ must evaluate all relevant evidence when determining an applicant's RFC[.]" *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence." *Id.* at 592.

### A. Substantial Evidence Does Not Support The ALJ's Rejection Of Dr. Jegan-Mohan's Opinion.

As discussed above, plaintiff's primary care physician, Dr. Jegan-Mohan, opined that plaintiff would need to elevate her legs above hip-level for 100% of an eight-hour workday. [12-2] 904. Dr. Jegan-Mohan based this opinion on having treated plaintiff for spina bifida, cellulitis, and neuropathy over an eight-year period.

---

[4] Because this issue is dispositive, the Court need not address plaintiff's other arguments for reversal.

The ALJ recognized that Jegan-Mohan was "one of the claimant's primary care providers" who had "multiple opportunities to independently examine the claimant over an extended period of time." [12-1] 23. Yet the ALJ's only basis for rejecting Dr. Jegan-Mohan's leg-elevation opinion was that it was inconsistent with plaintiff's work as an Uber driver through the date of the hearing. *See* [*id.*] ("The claimant's continued work-related activity through the date of the hearing . . . is similarly inconsistent with a suggested need for the claimant to elevate her legs above hip-level for the entirety of a regular work day.").

Even under a deferential standard of review, the Court finds that plaintiff's work as an Uber driver does not amount to substantial evidence for the ALJ's wholesale rejection of Dr. Jegan-Mohan's opinion. *See Pavlicek v. Saul*, 994 F.3d 777, 782 (7th Cir. 2021) (ALJ's decision to discount treating physician's opinion must be supported by substantial evidence); *see also Daquan S. v. Saul*, No. 19 CV 7804, 2021 WL 353999, at *3 (N.D. Ill. Feb. 2, 2021) ("the ALJ must support her medical opinion evaluation with substantial evidence").

Most importantly, the ALJ failed to explain how the sporadic nature of plaintiff's work as an Uber driver–work that was significantly limited in its frequency and duration by the very impairments that gave rise to Dr. Jegan-Mohan's opinion– contradicted Jegan-Mohan's opinion about plaintiff's need to elevate her legs. *See Martin v. Saul*, 950 F.3d 369, 375 (7th Cir. 2020) (ALJ may not "highlight[ ] facts that support a finding of non-disability while ignoring evidence to the contrary").

Plaintiff testified that she tried to drive five days per week, but that "maybe three times" per week she was unable to drive because she needed to "stay home and lift up [her] foot." [12-1] 49-51; *see also* [*id.*] 50 (plaintiff describing days when "I'm not able to push the pedal with my foot"). When plaintiff could work–days when plaintiff had to "push through" her "health issue[s]"–plaintiff could not be in the car "for a long period of time," by which she meant an hour. [*Id.*] 50. Plaintiff was thus left to work an average of two hours on those days when she did not need to be home elevating her foot. *See* [*id.*] 49. This testimony, which the ALJ did not specifically discuss–let alone reject as incredible–established that plaintiff's impairments imposed significant limitations on the frequency with which plaintiff drove for Uber and the duration of plaintiff's "shifts," such as they were.

In a similar vein, the ALJ ignored plaintiff's testimony that she drove for Uber *despite* the limitations associated with her spina bifida, cellulitis, and neuropathy. As courts have recognized, "employment is not proof positive of ability to work, since disabled people, if desperate (or employed by an altruist), can often hold a job. Put another way, one can be unemployable yet employed." *Potocki o/b/o Potocki v. Berryhill*, No. 16 C 7264, 2017 WL 3995816, at *8 (N.D. Ill. Sept. 11, 2017) (internal quotation marks and citation omitted); *accord Schmidt v. Barnhart*, 395 F.3d 737, 746 (7th Cir. 2005) (adverse credibility finding based on claimant's work history may be improper if claimant is "forced into seeking employment by desperate financial straits").

16

Here, plaintiff's testimony suggests that "she was unemployable" despite working–on a sporadic and limited basis–as an Uber driver. *Potocki*, 2017 WL 3995816, at *8. The following exchange between plaintiff and the ALJ establishes that plaintiff had to "push through" the limitations caused by her spina bifida, cellulitis, and neuropathy in order to drive for Uber:

> Q    How frequently does that happen that you can't do it because the health issue?
>
> A    That happens all the time.
>
> Q    How many times a week do you think you wanted to do it, and you just couldn't because of your health issue?
>
> A    All the time, every day.
>
> Q    But you do drive.
>
> A    Yes, yes.
>
> Q    So, what do you do, push through it? Or, do you stay home--?
>
> A    I have to--yes. Yes, I push through it.

[12-1] 51.

Plaintiff's testimony was consistent with other evidence in the record that plaintiff was highly motivated to continue working despite the potentially disabling effects of her multiple severe impairments. By February 2016, for example, Dr. Jegan-Mohan had recommended during more than one previous appointment that plaintiff consider applying for disability. [12-2] 781. According to Dr. Jegan-Mohan, however, plaintiff "had been reluctant" to do so because "she wished to be a productive member of society," and it was only when plaintiff learned that "with aging her

17

debility will result in further hospitalizations" that she decided to apply for disability. [*Id.*]. Likewise, in December 2015–only a month after being hospitalized for cellulitis–plaintiff saw Dr. Jegan-Mohan for a "significant left wound that was failing to heal adequately." [*Id.*] 778. Rather than seeking to avoid work entirely, plaintiff told Dr. Jegan-Mohan that she wanted to return to work, but "need[ed] a letter limiting her physical activity so that she does not end up with a similar wound." [*Id.*].

In response, the Acting Commissioner argues that the ALJ "sufficiently considered and discussed plaintiff's cellulitis and foot ulcers, contrary to plaintiff's claim that she simply ignored it." [22] 8. The Acting Commissioner's argument on this point consists largely of a lengthy summary of the ALJ's decision, *see* [*id.*] 4-8, and the Acting Commissioner reiterates the ALJ's conclusion that "the opinions that plaintiff needed to elevate her feet for much of the day was inconsistent with plaintiff's ability to work as an Uber driver and earn over substantial gainful activity levels" between 2015 and 2017. [*Id.*] 4. Neither argument provides a basis to affirm the ALJ's decision.

There is no question that the ALJ discussed the evidence of plaintiff's impairments in considerable detail, and the Court recognizes that the ALJ discounted Dr. Jegan-Mohan's opinion based on the supposed inconsistency between the limitations expressed in Jegan-Mohan's opinion and plaintiff's work as an Uber driver. But the issue presented by this case is whether the ALJ had a substantial evidentiary basis for rejecting the opinions of plaintiff's treaters that she needed to

elevate her legs between 90% and 100% of an eight-hour workday. For the reasons just given, the Court concludes that the ALJ had no such basis.

In short, there was abundant evidence in the record tending to show that (1) plaintiff's impairments significantly limited the frequency and duration of the work she could perform as an Uber driver, and (2) it was only by "push[ing] through" her health issues that plaintiff was able to perform even that limited work. Nevertheless– and without acknowledging or discussing any of that evidence–the ALJ improperly treated plaintiff's Uber driving as "proof positive of ability to work." *Potocki*, 2017 WL 3995816, at *8. The Court therefore concludes that the ALJ failed to provide a substantial evidentiary basis for her decision to accord "little to no weight" to Dr. Jegan-Mohan's opinion about plaintiff's need to elevate her legs.

### B. Substantial Evidence Does Not Support The ALJ's Rejection Of Dr. Caneva's Opinion.

Nor was the ALJ's rejection of Dr. Caneva's opinion about plaintiff's need to elevate her legs supported by substantial evidence.

Similar to Dr. Jegan-Mohan, Dr. Caneva opined that plaintiff would need to elevate her feet for at least 90% of an eight-hour work day. The ALJ gave "little to no probative weight" to this opinion because it was "wholly unsupported by any medical evidence of record suggesting any need for elevation at any level." [12-1] 24. More generally, the ALJ also found that Dr. Caneva's opinions were inconsistent with plaintiff's "documented work activity both before and after February 1, 2017, particularly given the nature of her ongoing work as an Uber driver." [*Id.*] 23. Finally, the ALJ found it "persuasive" that plaintiff "admit[ed] to caring for her personal

hygiene independently, preparing meals daily, performing a variety of household chores, and shopping in stores." [*Id.*].

First, the ALJ's conclusion that Dr. Caneva's opinion was "wholly unsupported by any medical evidence of record suggesting any need for elevation at any level" is demonstrably incorrect. Dr. Caneva counseled plaintiff on at least three occasions in the fall of 2017 regarding "elevation" as one method of treating her impairments. *See* [12-2] 1416, 1420, 1424. Nowhere in her decision did the ALJ discuss this evidence.

Second, and more fundamentally, the ALJ's sweeping conclusion ignores the obvious relationship between Dr. Caneva's opinion and plaintiff's cellulitis and recurrent neuropathic ulcers. As discussed above, Dr. Caneva's treatment notes from 2016 and 2017 demonstrate that plaintiff regularly presented for treatment with neuropathic ulcers on one or both of her feet. Dr. Caneva also opined that plaintiff's neuropathy left her "at risk for skin breakdown and cellulitis if she stands or walks for more than 5-10 minutes at [a] time." [12-2] 896. That Dr. Caneva had previously counseled plaintiff to treat these issues by elevating her legs, and that he opined in the RFC questionnaire that plaintiff would need to elevate her legs if working, clearly suggests that leg-elevation was intended either to prevent further neuropathic ulcers or help plaintiff recover from such ulcers. Contrary to the ALJ's misguided and factually unsound conclusion, Dr. Caneva's treatment notes amply supported this opinion.

Third, what the ALJ characterized as plaintiff's "admitted" ability to perform certain activities of daily living, [12-1] 23, does not provide substantial evidence for rejecting Dr. Caneva's opinion.

It is permissible for an ALJ to discount a treating physician's opinion based on inconsistencies between the physician's opinion regarding the severity of a claimant's impairment and its resulting limitations and the claimant's ability to perform activities of daily living. *See Gebauer v. Saul*, 801 F. App'x 404, 410-11 (7th Cir. 2020). But the Seventh Circuit "has repeatedly cautioned against placing undue weight on a claimant's activities of daily living." *Fowler v. Colvin*, No. 13 CV 3262, 2015 WL 720954, at *3 (N.D. Ill. Feb. 18, 2015). "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . and is not held to a minimum standard of performance, as she would be by an employer." *Bjornsen v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012).

Here, however, plaintiff testified to only a limited ability to perform a very narrow range of activities of daily living: her son did the grocery shopping, her daughter-in-law cooked the family's meals, and plaintiff did not care for her grandchildren at all–though she did do her own laundry. In these circumstances, the ALJ's reliance on plaintiff's activities of daily living does not constitute substantial evidence for rejecting Dr. Caneva's opinion–which was otherwise amply supported by the length of his treating relationship with plaintiff, treatment notes, and his expertise as a podiatrist. *Cf. Gwendolyn P. v. Kijakazi*, No. 20 C 3339, 2021 WL

5204858, at *8 (N.D. Ill. Nov. 9, 2021) (ALJ permissibly discounted treating physicians' opinions that were "not consistent with or supported by the medical record" and were contradicted by plaintiff's "reported ability to independently manage numerous activities of daily living").

Finally, to the extent that the ALJ discredited Dr. Caneva's opinion based on plaintiff's work as an Uber driver, *see* [12-1] 23-34, that reliance is flawed for the same reasons discussed above with respect to the ALJ's mishandling of Dr. Jegan-Mohan's opinion.

\*   \*   \*

In sum, the ALJ's decision must be reversed because the ALJ failed to develop a substantial evidentiary basis for according little to no weight to the opinions of plaintiff's treating physicians.

### Conclusion

Plaintiff's motion for summary judgment [14] is granted, and the Commissioner's request for summary affirmance [22] is denied. The decision of the SSA is reversed, and, in accordance with the fourth sentence of 42 U.S.C. § 405(g), this case is remanded for further proceedings consistent with this Memorandum Opinion and Order.

**HEATHER K. McSHAIN**
**United States Magistrate Judge**

**DATE: January 6, 2022**